UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ALICIA BETTES,

Plaintiff,

v.

ALTICE USA, INC. & ROBERT RIVAS,

Defendants.
-------------------------------------------------------------X

**MEMORANDUM AND ORDER**
23-CV-3128-SJB-ST

**BULSARA, United States District Judge:**

Plaintiff Alicia Bettes filed this action against her former employer Defendant Altice USA, Inc. ("Altice"), and former supervisor Defendant Robert Rivas, (together, "Defendants"), alleging violations of the Family and Medical Leave Act ("FMLA") and the New York State Human Rights Law ("NYSHRL"). Bettes alleges that Defendants interfered with her right to FMLA leave while attending to her dying mother and when recovering from COVID-19. She also alleges that they discriminated against her in denying her requests for office accommodations and work from home to recover from shoulder surgery, ultimately firing her in retaliation. Defendants have moved for summary judgment on all of Bettes's claims. (Defs.' Mot. for Summ. J. dated Sep. 30, 2025 ("Defs.' Mot."), Dkt. No. 61-1). For the following reasons, Defendants' motion is granted in part and denied in part.

## STANDARD FOR SUMMARY JUDGMENT

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

"A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways. Fed. R. Civ. P. 56(c)(1). It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials." *Id.* R. 56(c)(1)(A). Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* R. 56(c)(1)(B); *cf. Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

In moving for summary judgment or answering such a motion, litigants are required by the Local Rules to provide a statement (a Rule 56.1 statement) setting forth purported undisputed facts or, if controverting any fact, responding to each assertion. *See* Loc. Civ. R. 56.1(a)–(b). In both instances, the party must support its position by citing to admissible evidence from the record. *Id.* R. 56.1(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting

a purported material fact). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

Where claims in opposing Rule 56.1 statements are "genuinely disputed," the Court will consider the evidentiary sources of the claims. *Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) (adopting report and recommendation). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole—weigh evidence or assess the credibility of witnesses. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). Furthermore, "[l]egal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded." *Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1. The facts . . . are taken from those assertions contained in the Local Rule 56.1 statements that comply with Local Rule 56.1[.]" (citations omitted)). The court may not grant summary judgment based on a fact in a Rule 56.1 statement—even if undisputed—not supported by admissible evidence. *E.g.*, *Giannullo v. City of New York*, 322 F.3d 139, 142–43 (2d Cir. 2003) (vacating grant of summary judgment to defendants based on facts enumerated in

Rule 56.1 statement supported only by arguments in briefs rather than admissible evidence). The Court must also disregard conclusory denials that lack citations to admissible evidence. *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record. They should not contain conclusions[.]"), *aff'd*, 56 F. App'x 27, 29 (2d Cir. 2003). Also, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted." Loc. Civ. R. 56.1(c). The Court also does not give any consideration to hearsay, speculation, or inadmissible evidence in evaluating declarations or affidavits. *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) ("[A] court is obliged not to consider inadmissible evidence at the summary judgment stage[.]"); *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007) ("[A] non-moving party 'must set forth specific facts showing that there is a genuine issue for trial;' he or she 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005))), *aff'd*, 324 F. App'x 139, 143 (2d Cir. 2009).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Court finds the following facts—drawn from the pleadings, the parties' respective Rule 56.1 statements, and supporting affidavits and exhibits attached thereto—are undisputed unless otherwise noted. Where a relevant genuine dispute

exists, the Court highlights both parties' versions of the facts. But the Court does not consider portions of the parties' Rule 56.1 statements that are legal conclusions, irrelevant, or merely objections to inferences drawn from the opposing party's statements.

Altice is an internet, television, and phone service provider that owns several brands, including News 12 Networks, which provides local news coverage in communities throughout the New York Metropolitan area. (Defs.' 56.1 Statement dated Sep. 30, 2025 ("Defs.' 56.1 Stmt."), Dkt. No. 61-41 ¶¶ 1–2; Pl.'s Resp. to Defs.' 56.1 Stmt. dated Dec. 1, 2025 ("Pl.'s 56.1 Resp."), Dkt. No. 61-90 ¶¶ 1–2). Altice hired Bettes as an Executive Producer for News 12 Long Island in July 2021. (*Id.* ¶ 3; Defs.' 56.1 Stmt. ¶ 3). Starting in February 2022, Bettes reported directly to Rivas, News Director at News 12. (*Id.* ¶¶ 4–5; Pl.'s 56.1 Resp. ¶¶ 4–5).

Altice maintains a Family/Medical Leave Policy that details employees' rights under the FMLA. (*Id.* ¶ 13; Defs.' 56.1 Stmt. ¶ 13; *see also* Altice Family/Medical Leave Policy dated Jan. 1, 2021 ("FMLA Policy"), attached to Decl. of Joseph Vento ("Vento Decl.") as Ex. G, Dkt. No. 61-9). During the relevant period, the policy directed employees to contact Altice's third-party leave administration provider, which at the time was Lincoln Financial ("Lincoln"), which would then assess whether an employee's request constituted a qualifying event under the FMLA. (Defs.' 56.1 Stmt. ¶¶ 14–15; Pl.'s 56.1 Resp. ¶¶ 14–15; FMLA Policy at 3 ("If your need for [FMLA] leave is foreseeable, you must provide [Lincoln] with at least thirty days' prior written notice, and for all unexpected leave requests, please make your requests as timely as possible

and you should follow applicable call-in procedures[.]")). Bettes admits to having received and reviewed a copy of Altice's FMLA Policy during her onboarding, and knew it was available on Altice's company intranet site. (Defs.' 56.1 Stmt. ¶ 17; Pl.'s 56.1 Resp. ¶ 17). Altice also maintained a COVID-19 Administrative Leave Policy that provided employees with additional paid time off if sick with COVID-19. (*Id.* ¶ 20; Defs.' 56.1 Stmt. ¶ 20).

On August 22, 2022, Bettes requested an accommodation of ergonomic equipment for her office desk due to pain in her shoulder. (*Id.* ¶ 38; Pl.'s 56.1 Resp. ¶ 38). Early that summer, Bettes's orthopedic doctor, Dr. Gregory Lieberman, had diagnosed her with tendonitis. (Pl.'s Rule 56.1 Counter-Statement of Additional Material Facts ("Pl.'s 56.1 Stmt."), Dkt. No. 61-90 ¶ 173; Defs.' Resp. to. Pl.'s 56.1 Stmt. ("Defs.' 56.1 Resp."), Dkt. No. 61-101 ¶ 173). She submitted a letter from a nurse practitioner stating that she required accommodations such as an ergonomic mouse and footrest. (Pl.'s 56.1 Resp. ¶ 39; Defs.' 56.1 Stmt. ¶ 39). Altice processed the request through Lincoln which opened a case on August 26, 2022, and Lincoln representative Sharonda Hicks spoke with Bettes about her request a few days later. (*Id.* ¶¶ 40–41; Pl.'s 56.1 Resp. ¶¶ 40–41). Lincoln received a completed accommodation questionnaire from Dr. Lieberman on September 13, 2022 stating that Bettes suffered from tendonitis in her shoulder and had trouble with certain movements such as engaging in repetitive motions and using her upper extremity, recommending that she be provided with certain ergonomic equipment, but noting that the condition was "temporary." (*Id.* ¶¶ 43–44; Defs.' 56.1 Stmt. ¶¶ 43–44). Lincoln then requested a second questionnaire

from Dr. Lieberman to clarify the temporary nature of the condition, which he submitted on October 4, 2022 clarifying that Bettes's need for ergonomic equipment was "permanent" but her condition requiring the accommodation was "temporary" pending a post-operation evaluation. (*Id.* ¶¶ 45–47; Pl.'s 56.1 Resp. ¶¶ 45–47). On October 6, 2022, Hicks reported to Altice's HR Accommodations Team several options to accommodate Bettes's request, including standing desks and gel wrist pads. (*Id.* ¶ 48; Defs.' 56.1 Stmt. ¶ 48; Lincoln Email, attached to Decl. of Raylene Hobbs ("Hobbs Decl.") as Ex. D, Dkt. No. 61-37 at 396–97).

On October 10, 2022, Bettes submitted a second request to Lincoln stating that she was scheduled for shoulder surgery on November 22, 2022 and seeking leave through November 27, 2022, followed by a period of remote work until January 2, 2023. (Defs.' 56.1 Stmt. ¶ 49; Pl.'s 56.1 Resp. ¶ 49). Bettes explained that she would be unable to drive for at least six weeks and was expected to be in pain and without use of her left arm. (*Id.* ¶ 50; Defs.' 56.1 Stmt. ¶ 50). A second Lincoln representative, Triska Henry-Byrd, submitted a new request to Dr. Lieberman for supporting documentation, which he submitted on October 19, 2022, stating that Bettes required a continuous leave of absence through February 20, 2023 as she could not lift, carry, push, pull, or perform repetitive movements at least until her next post-surgery evaluation on December 2, 2022. (*Id.* ¶¶ 51–53, 55; Pl.'s 56.1 Resp. ¶¶ 51–53, 55). Henry-Byrd then provided Altice on October 25, 2022 with several accommodation options including work in office with restrictions or work from home until her next evaluation in December. (*Id.* ¶ 56; Defs.' 56.1 Stmt. ¶ 56).

Also in October 2022, Bettes's mother, who had been battling cardiac amyloidosis since 2019, was hospitalized. (*Id.* ¶¶ 24, 27; Pl.'s 56.1 Resp. ¶¶ 24, 27). From October 10th to 18th, Bettes provided the HR department daily updates on her mother's condition so that they could be prepared for her absence on short notice. (Pl.'s 56.1 Stmt. ¶ 186; Defs.' 56.1 Resp. ¶ 186). Around October 19, 2022, Bettes informed Amy Waldman, the News 12 Long Island Assistant News Director, that she needed to return home to Chicago to be with her mother who was not expected to make it through the week. (Defs.' 56.1 Stmt. ¶¶ 7, 28; Pl.'s 56.1 Resp. ¶¶ 7, 28; Pl.'s 56.1 Stmt. ¶¶ 187–88). Waldman told Bettes "[a]bsolutely, just go," and Bettes left the next day. (Defs.' 56.1 Stmt. ¶ 29; Pl.'s 56.1 Resp. ¶ 29). Shortly after Bettes's arrival at the hospital, her mother lost consciousness and passed away two days later. (*Id.* ¶¶ 30–31; Defs.' 56.1 Stmt. ¶¶ 30–31). Bettes contends that she cared for her mother in the hospital by comforting her and helping make medical decisions for her care. (Pl.'s 56.1 Stmt. ¶ 189; Defs.' 56.1 Resp. ¶ 189).

Bettes received paid time off for the time she missed work prior to her mother's passing, as well as five days of paid bereavement leave and two more days of paid time off, after which she returned to work. (Defs.' 56.1 Stmt. ¶¶ 32–33; Pl.'s 56.1 Resp. ¶¶ 32–33). Bettes alleges that she had wanted to take additional time off but never made a request because she was busy and could not afford to "take off more time financially without . . . exhausting [her] PTO." (*Id.* ¶ 35; Defs.' 56.1 Stmt. ¶ 35).

On October 28, 2022, a member of Altice's HR Accommodations Team, Mefarold Oakry-Wilson, emailed Hicks to confirm whether Bettes still required ergonomic

equipment given Bettes's request to work from home; Hicks replied "[y]es, if she is going to be working from home the request is no longer needed," suggesting it be closed. (Defs.' 56.1 Stmt. ¶ 57; Pl.'s 56.1 Resp. ¶ 57). On November 8, 2022, Altice approved Bettes's request to work from home beginning November 28, 2022 following her surgery and through her re-evaluation scheduled for December 2, 2022. (*Id.* ¶ 59; Defs.' 56.1 Stmt. ¶ 59). Oakry-Wilson then closed the first accommodation request for ergonomic equipment. (*Id.* ¶ 60; Pl.'s 56.1 Resp. ¶ 60).

On December 2, 2022, Dr. Lieberman provided Lincoln with a letter stating that Bettes was "recovering from surgery" and was to "work from home until at least 2/22/23." (*Id.* ¶ 68; Defs.' 56.1 Stmt. ¶ 68). Henry-Byrd told Bettes that such a statement was conflicting and required clarification. (*Id.* ¶ 69; Pl.'s 56.1 Resp. ¶ 69). Bettes submitted a letter from Dr. Lieberman three days later stating that her medical condition was not permanent but that she was restricted from lifting, carrying, pushing, and pulling until her next evaluation in January 2023 and reiterating that she should work from home through February. (*Id.* ¶¶ 71–72; Defs.' 56.1 Stmt. ¶¶ 71–72). He also stated that she was "sufficiently recovered" and could return to at-home work. (*Id.* ¶ 73; Pl.'s 56.1 Resp. ¶ 73). The next day, Henry-Byrd provided Altice's HR Accommodations Team with an amended report suggesting options to accommodate Bettes's post-surgery restrictions including work in office with certain restrictions and work from home "through February 22 or any agreed upon period," and the HR Team then forwarded the report to Rivas for a decision. (*Id.* ¶¶ 75–76; Defs.' 56.1 Stmt. ¶¶ 75–76). Rivas determined that Bettes's request to work from home beyond January 2, 2023

presented an undue hardship on News 12 Long Island and approved the request to work from home only until January 3, 2023. (*Id.* ¶¶ 84–85; Pl.'s 56.1 Resp. ¶¶ 84–85).

After the decision was communicated to Bettes, she immediately protested that she was unable to return to work by January 3, 2023 as she was still waiting to begin physical therapy and was restricted in the use of her arm, to which the Altice Accommodations Representative, Hobbs, responded that the company had several options to accommodate her and that Dr. Lieberman had indicated that she could return to the office with restrictions.[1] (*Id.* ¶¶ 87–88; Defs.' 56.1 Stmt. ¶¶ 87–88). Bettes responded that it was "highly unlikely" that she would be able to "dress appropriately, sit at a desk or drive" since she was not supposed to use her left arm. (*Id.* ¶ 89; Pl.'s 56.1 Resp. ¶ 89). She then submitted an updated form from Dr. Lieberman wherein he reiterated her restrictions and his recommendation, adding that she had trouble dressing and driving. (*Id.* ¶ 90; Defs.' 56.1 Stmt. ¶ 90).

---

[1] Bettes contests that Dr. Lieberman said she could return to the office. (Pl.'s 56.1 Resp. ¶ 88). Defendants rely on the fact that Dr. Lieberman's report contains no specifics as to any restrictions that would prevent her from working from the office. (*See* Patient Information Report, attached to Pl.'s Opp'n as Ex. 14, Dkt. No. 61-58 at 464). But he states, albeit in a conclusory manner, that she "is to work from home until 2/22/23." (*Id.*).

Bettes did not return to in-person work on January 3, 2023, prompting Hobbs to reach out on January 11, 2023.[2] (*Id.* ¶¶ 92–93; Pl.'s 56.1 Resp. ¶¶ 92–93). Bettes explained that she was still struggling to dress for work and drive herself, and Hobbs responded that she could "dress down" and explained the availability of certain company commuter benefits. (*Id.* ¶¶ 95–96; Defs.' 56.1 Stmt. ¶¶ 95–96). Hobbs, discovering that the pre-surgery request for ergonomic equipment had never been completed, ensured that Bettes had a standing desk with gel wrist pads for her return to the office on January 17, 2023. (*Id.* ¶¶ 97–98; Pl.'s 56.1 Resp. ¶¶ 97–98).

On January 19, 2023, Bettes submitted a ticket to Altice's HR reporting that she had tested positive for COVID-19, asking what her "next steps" were, similarly informing her superiors Rivas and Waldman who instructed her to "stay home." (*Id.* ¶¶ 104–05; Defs.' 56.1 Stmt. ¶¶ 104–05). That day, Bettes had a virtual visit with a physician who prescribed her an antiviral and nasal spray. (*Id.* ¶ 115; Pl.'s 56.1 Resp. ¶ 115). The next day, an HR representative contacted Bettes to advise that she would receive three days of paid time off under Altice's COVID-19 policy and that if she

[2] The content of the call between Hobbs and Bettes is disputed. Defendants contend that they discussed Bettes's post-surgery restrictions and Hobbs offered to help Bettes in any way she could. (Defs.' 56.1 Stmt. ¶ 94 (citing Hobbs Decl., Dkt. No. 61-33 ¶ 10)). Bettes contends that Hobbs presented her with an ultimatum of returning to work in person or resigning. (Pl.'s 56.1 Resp. ¶ 94 (citing Decl. of Alicia Bettes ("Bettes Decl."), Dkt. No. 61-89 ¶ 49)). Defendants contend that Bettes's Declaration is "largely a 'sham' declaration that should be disregarded." (Defs.' Reply at 3). A sham declaration exists only where the information provided is inconsistent with prior testimony. *See Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014) ("The principle is that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." (quotations omitted)). Defendants do not point to any specific inconsistencies, but to the extent they exist, this Court does not rely on them.

needed more time, she should contact Lincoln. (*Id.* ¶¶ 106–07; Defs.' 56.1 Stmt. ¶¶ 106–07). Bettes ultimately received five days of paid COVID-19 leave and was informed that her return date would be January 26, 2023. (*Id.* ¶ 109; Pl.'s 56.1 Resp. ¶ 109).

Bettes was terminated on January 26, 2023 in a phone call with Rivas and the Senior HR Business Partner, Colleen Dunn. (*Id.* ¶ 145; Pl.'s 56.1 Resp. ¶ 145). The parties dispute the contents of the conversation, and Bettes's performance leading up to her termination. Bettes claims that Rivas cited her "availability" as one of the reasons for her termination, (Pl.'s 56.1 Resp. ¶ 148), which Defendants deny, (Defs.' 56.1 Stmt. ¶ 148). Defendants claim that for several months, leadership was dissatisfied with Bettes's performance, including reports from other employees that her leadership was ineffective. (*Id.* ¶ 119; *see also id.* ¶ 121 (citing leadership meeting note in April 2022 stating: "[Bettes] performance expectations—not engaging and leading at appropriate levels")). Shortly after Bettes's termination, Altice also terminated Rivas and Waldman. (*Id.* ¶ 7; Pl.'s 56.1 Resp. ¶ 7). Defendants argue that Altice leadership—specifically Altice's Chief Content Officer, Kristen Malaspina, and Altice Vice President of News, Audrey Gruber—made the decision to terminate all three simultaneously and as part of a larger News 12 Long Island leadership decision, given low ratings and complaints of poor newsroom management. (Defs.' 56.1 Stmt. ¶¶ 7, 78, 135–38, 141).

Bettes commenced this action on April 25, 2023 alleging violations of the FMLA and NYSHRL. (Compl., Dkt. No. 1). She filed an amended complaint on August 3, 2023. (Am. Compl., Dkt. No. 19). The Amended Complaint raises three causes of action: (1) interference and retaliation in violation of the FMLA, (*id.* ¶¶ 142–46),

(2) discrimination in violation of the NYSHRL, (*id.* ¶¶ 147–54), and (3) retaliation in violation of the NYSHRL, (*id.* ¶¶ 155–62). The parties completed briefing on Defendants' motion on December 8, 2025. (Defs.' Mot.; Pl.'s Opp'n to Defs.' Mot. dated Nov. 21, 2025 ("Pl.'s Opp'n"), Dkt. No. 61-43; Defs.' Reply in Supp. of Defs.' Mot. dated Dec. 8, 2025 ("Defs.' Reply"), Dkt. No. 61-91).[3]

DISCUSSION

**I. FMLA Claims**

The FMLA entitles "employees to take reasonable leave for medical reasons . . . and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2). It "provides broad protections to employees who need to take time away from work to deal with serious health conditions of the employee or her family." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 165–66 (2d Cir. 2017).

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). A plaintiff may raise separate claims for interference with rights and for retaliation against the exercise of those rights. *Woods*, 864 F.3d at 166. "[A]n employee brings an interference claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA." *Haran v. Orange Bus. Servs., Inc.*, 160 F.4th 51, 56 (2d Cir. 2025) (quotation omitted). Retaliation

[3] The case was transferred from the Honorable Nicholas G. Garaufis to the undersigned on January 8, 2025.

"involve[s] an employee actually exercising her rights . . . and then being subjected to some adverse employment action by the employer." *Id.* (quotation omitted).

Bettes alleges that Defendants interfered with her rights under the FMLA and retaliated against her for taking protected FMLA leave. (Am. Compl. ¶ 143). Defendants seek summary judgment on both claims.

### A. FMLA Interference

To establish a claim of FMLA interference, a plaintiff must show:

> 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA.

*Haran*, 160 F.4th at 56–57 (quotation omitted).

Bettes claims that Defendants interfered with her right to take FMLA leave on two occasions: (1) when Bettes went to care for her ailing mother in October 2022 and (2) when she missed five days of work while sick with COVID-19 in January 2023. (Am. Compl. ¶¶ 63–68, 116–120). Defendants do not contest that Bettes is an eligible employee under the FMLA or that Altice is an employer covered by the FMLA. Rather, they argue that Bettes never provided sufficient notice of her intention to take FMLA

leave and that Bettes was not denied any FMLA benefits. (Defs.' Mot. at 5, 9).[4] The Court agrees.

"The FMLA and its related regulations impose several notice requirements on both employees and employers." *Haran*, 160 F.4th at 56. First, an employee must "provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." *Id.* (quoting 29 C.F.R. § 825.302(c)). Once an employee requests FMLA leave or the employer "acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days." *Id.* (quoting 29 C.F.R. § 825.300(b)(1)). Under § 825.302(d):

> [a]n employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. For example, an employer may require that written notice set forth the reasons for the requested leave, the anticipated duration of the leave, and the anticipated start of the leave. An employee also may be required by an employer's policy to contact a specific individual.

[4] Defendants also challenge whether Bettes was entitled to FMLA leave on either occasion because she lacked a protected, qualifying reason. (Defs.' Mot. at 7). The FMLA covers leave that is necessary to "care for" a family member with a "serious health condition" or when a "serious health condition . . . makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(C)–(D). The parties dispute whether Bettes provided her mother sufficient care and whether her COVID-19 diagnosis was sufficiently serious as to qualify under the FMLA. Given that Defendants are otherwise entitled to summary judgment on the FMLA claims, the Court does not address these disputes.

29 C.F.R. § 825.302(d). Failure to comply with an employer's procedural requirements, absent unusual circumstances, may be treated as a failure to provide notice. *See Kelly v. Hartford Fin. Servs. Grp.*, 818 F. App'x 83, 85 (2d Cir. 2020).

It is undisputed that Bettes received a copy of Altice's FMLA policy when she was onboarded and knew that the policy resided on Altice's intranet. (Defs.' 56.1 Stmt. ¶ 17; Pl.'s 56.1 Resp. ¶ 17; *see also* Dep. of Alicia Bettes ("Bettes Dep."), attached to Vento Decl. as Ex. B, Dkt. No. 61-4 at 145:6-25 (testifying to recognizing and having read Altice's FMLA policy)). Yet, Bettes made no request to Lincoln for FMLA leave either in October 2022 to be with her mother or January 2023 when she was sick with COVID-19.[5] In her deposition, Bettes acknowledged that she never invoked or attempted to use FMLA leave:

> Q: Did you ever request FMLA time or FMLA leave during your employment at News 12?
> A: No.
> Q: If you wanted to request FMLA leave during your employment at News 12, do you know what that process would have been?
> . . . .
> A: First of all, I would have spoken to my managers about it to let them know what was going on, and then I would have contacted HR for next

[5] Bettes contends inquiry notice is sufficient. (Pl.'s Opp'n at 12, 22). But Bettes ignores § 825.302(d) altogether. That inquiry notice may be sufficient to trigger the employer's obligation to notify the employee of FMLA eligibility does not undermine that the FMLA permits employers to require compliance with particular notice procedures. *Amley v. Sumitomo Mitsui Banking Corp.*, No. 19-CV-3777, 2021 WL 4429784, at *11 (S.D.N.Y. Sep. 27, 2021) ("Plaintiff puts the proverbial car[t] before the horse. Defendant had no obligation to inquire further into Plaintiff's condition or inform him of his rights under the FMLA unless Defendant was first properly notified by Plaintiff, pursuant to company procedures. . . . [I]t is undisputed that the Plaintiff did not comply with SMBC's FMLA notification procedures at any time. That alone defeats any FMLA interference claim predicated on an employer's failure to give notice." (citation omitted)).

> steps, which would have led me to the group that handled the paperwork of processing FMLA.
> Q: Is that group Lincoln basically?
> A: Yes
> . . . .
> Q: Did you ever raise it to your managers that you wanted to take FMLA leave?
> A: No.
> . . . .
> Q: Why not?
> A: At the time I didn't need it. . . . Because any time I took off I used my own personal time.

(Bettes Dep., attached to Vento Decl. as Ex. B, Dkt. No. 61-4 at 147:2–148:25). Nor does Bettes establish any "unusual circumstances" that would excuse her noncompliance with Altice's procedures. *See* 29 C.F.R. § 825.302(d) (giving as an illustration of an "unusual circumstance" a situation in which "there is no one to answer the call-in number" for making leave requests and the "voice mail box is full"). As such, Bettes cannot establish proper notice of her intent to seek FMLA leave and the claim fails. *See, e.g.*, *Kelly*, 818 F. App'x at 85 (affirming grant of summary judgment where plaintiff neither properly applied through employer's established FMLA procedures nor pointed to any unusual circumstances that precluded him from doing so); *Amley v. Sumitomo Mitsui Banking Corp.*, No. 19-CV-3777, 2021 WL 4429784, at *8 (S.D.N.Y. Sep. 27, 2021) (dismissing plaintiff's FMLA interference claim on summary judgment where plaintiff failed to provide notice of his intent to take leave given that it was "uncontested that Plaintiff never took any of [the] steps" required by the employer's FMLA policy "[e]ven though he had signed a form acknowledging receipt of [the employer's] handbook, which detailed the company's policy, and he knew how to contact Human Resources").

Even if Bettes had satisfied her notice requirement, there is no indication that she was prejudiced or denied any benefits under the FMLA. To obtain relief for FMLA interference, "a litigant must show that the violation was prejudicial." *Blodgett v. 22 S. St. Operations, LLC*, 828 F. App'x 1, 5 (2d Cir. 2020) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). When Bettes went to be with her mother in October of 2022, she informed her superior, Waldman, who told her "[a]bsolutely, just go" and Bettes left the next day. (Defs.' 56.1 Stmt. ¶¶ 28–29; Pl.'s 56.1 Resp. ¶¶ 28–29). Bettes received paid time off for the entire period she missed work and received five days of paid bereavement and two additional paid days off. (*Id.* ¶ 32; Defs.' 56.1 Stmt. ¶ 32). While she testifies that she wanted to take additional time off, she never requested any,[6] and ultimately was granted leave for the time she explicitly sought. *See Blodgett*, 828 F. App'x at 5 (affirming grant of summary judgment where plaintiff had "not shown she was denied a benefit owed to her under the FMLA" as she "received all the time she requested and ha[d] not otherwise shown that her personal leave was somehow inferior to leave under the FMLA").

As to her COVID-19 diagnosis in January 2023, Bettes similarly did not seek any additional time off beyond the paid five days she received pursuant to company policy.

[6] In her deposition, Bettes explained that she did not seek additional time because she was busy and could not afford to "take off more time financially, without, you know, exhausting [her] PTO." (Defs.' 56.1 Stmt. ¶ 35 (citing Bettes Dep., attached to Vento Decl. as Ex. B, Dkt. No. 61-4 at 213:3–214:5)). While in her declaration Bettes states that she was initially hesitant to travel to Chicago to be with her mother out of fear of how Rivas would react, (*see* Bettes Decl. ¶ 28), she testified in her deposition that nobody gave her issues with taking time off to help with her mother, (Bettes Dep., attached to Vento Decl. as Ex. B, Dkt. No. 61-4, at 210:3-7), and nobody told her that she had to return to work when she was on leave, (*id.* at 212:22–213:2).

(Defs.' 56.1 Stmt. ¶¶ 109–10; Pl.'s 56.1 Resp. ¶¶ 109–10). And it is undisputed that Altice HR informed her that "[i]f [she] need[ed] additional time" she should "contact Lincoln to open a leave of absence." (*Id.* ¶ 107; Defs.' 56.1 Stmt. ¶ 107; *see also* Bettes Dep., attached to Vento Decl. as Ex. B, Dkt. No. 61-4 at 165:14-25 (testifying that she did not ask for more time related to her COVID-19 illness because she was not sure if she would still be positive); *id.* at 168:23–169:5 (affirming that no one told her that she could not take any more time off)). And she again received paid leave. (Defs.' 56.1 Stmt. ¶ 109; Pl.'s 56.1 Resp. ¶ 109). Any FMLA interference claim fails. *See Greenberg v. State Univ. Hospital-Downstate Med. Ctr.*, 838 F. App'x 603, 606 (2d Cir. 2020) (affirming dismissal of FMLA interference claim where it was undisputed that the employer granted plaintiff "the full amount of time he requested as 'sick leave'" and plaintiff "was fully compensated for both days"); *Hahn v. Off. & Pro. Emps. Int'l Union, Loc. 153*, No. 13-CV-0946, 2016 WL 4120517, at *4 (S.D.N.Y. July 22, 2016) ("Because Hahn received his requested sick days and his full wages, which were benefits beyond the FMLA requirements, no economic harm resulted from inadequate notice. Without material harm, technical violations are not substantive violations of a worker's FMLA rights." (citations omitted)).

**B. FMLA Retaliation**

Bettes also alleges that Defendants retaliated against her by terminating her employment after she took FMLA leave. (Am. Compl. ¶ 143). A claim for FMLA retaliation is governed by the familiar burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429

(2d Cir. 2016). Plaintiff first bears the burden of making out a prima facie case of retaliation by showing that she (1) "exercised rights protected under the FMLA," (2) "was qualified for [her] position," (3) "suffered an adverse employment action," and (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Id.* (quotation omitted). "If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Id.*

Bettes's claim fails at the first step of a prima facie case. To state a claim for retaliation under the FMLA, plaintiff must have exercised her FMLA rights. *See Hahn*, 2016 WL 4120517, at *5 ("A plaintiff fails to exercise rights protected under the FMLA when the employee does not . . . invoke the FMLA."). Ultimately, Bettes's FMLA retaliation claim fails for the same reason as does her FMLA interference claim: Bettes failed to seek FMLA leave. Bettes cannot claim to have been retaliated against for a right she never exercised.

In all, summary judgment is granted as to Bettes's FMLA claims and the claims are dismissed.

## II. NYSHRL Claims[7]

The Court now turns to Bettes's claims under the NYSHRL. The NYSHRL is a general anti-discrimination statute, prohibiting employment discrimination on the basis of a wide range of categories, including "disability." *See* N.Y. Exec. Law § 296(1)(a). Courts evaluate NYSHRL claims using the *McDonnell Douglas* burden-shifting framework. *See Tafolla v. Heilig*, 80 F.4th 111, 118 (2d Cir. 2023); *Furfero v. St. John's Univ.*, 94 A.D.3d 695, 696–97 (2d Dep't 2012). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination or retaliation. *See Uttarwar v. Lazard Asset Mgmt. LLC*, No. 24-1085, 2025 WL 704278, at *2–*3 (2d Cir. 2025). Once a plaintiff has established a prima facie case of discrimination or retaliation, the burden shifts to the employer to articulate some "legitimate, nondiscriminatory reason" for the employer's action against the employee. *Id.* "If that burden is met, the burden returns to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Id.* (quotation omitted). Bettes raises claims for both discrimination and retaliation in violation of the NYSHRL. (Am. Compl. ¶¶ 147–62).

---

[7] While the Amended Complaint alleged jurisdiction over the state claims based on supplemental jurisdiction, (Am. Compl. ¶ 6), and the federal claims are now dismissed, the Court finds that there is nonetheless subject matter jurisdiction over the state law claims based on diversity. The parties were citizens of different states at the time the Amended Complaint was filed, (*see* Pl.'s Rule 7.1 Statement, Dkt. No. 63; Defs.' Rule 7.1 Statement, Dkt. No. 64), and the jurisdictional amount is satisfied, (Pl.'s Letter dated July 5, 2026, Dkt. No. 65).

### A. Failure to Accommodate

Bettes alleges that Defendants discriminated against her based on her disability in failing to provide reasonable accommodations. (*Id.* ¶ 148).

The NYSHRL "require[s] an employer to provide a reasonable accommodation for an employee's disability unless the accommodation would impose an undue hardship on the employer." *See Tafolla*, 80 F.4th at 118 (citing N.Y. Exec. Law § 296(3)(a)–(b)).[8] To make out a prima facie disability discrimination claim based on a failure to accommodate, a plaintiff must establish that "(1) plaintiff is a person with a disability under the meaning of the [NYSHRL]; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Id.* (quotation omitted).

Bettes alleges that Defendants failed to provide two accommodations requested: (1) ergonomic equipment before and after her shoulder surgery; and (2) the ability to work remotely after her surgery.

[8] The conduct at issue occurred in 2022–2023, after the NYSHRL was amended "to align with the [New York City Human Rights Law's ("NYCHRL")] more liberal pleading standard." *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 123 (2d Cir. 2024); *see* N.Y. Exec. Law § 300 ("The provisions of this article shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed."). The record does not support a claim for failure to accommodate under any standard.

Turning first to the request for ergonomic equipment, where the accommodation is provided but delayed not denied,[9] federal courts use two different standards to determine whether the delay constitutes unlawful discrimination. One test requires a plaintiff to show the delay was "motivated by the employer's discriminatory intent, as opposed to mere negligence." *See Logan v. Matveevskii*, 57 F. Supp. 3d 234, 258 (S.D.N.Y. 2014); *Binder v. Pub. Serv. Enter. Grp., Inc.*, No. 2:19-cv-5787, 2022 WL 307813, at *13 & n.8 (E.D.N.Y. Feb. 2, 2022) (collecting district court cases in the Second Circuit pursuant to the ADA). The other requires showing that delay is "unreasonable." "Whether a particular delay qualifies as unreasonable necessarily turns on the totality of the circumstances, including, but not limited to, such factors as the employer's good faith in attempting to accommodate the disability, the length of the delay, the reasons for the delay, the nature, complexity, and burden of the accommodation requested, and whether the employer offered alternative accommodations." *McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020). The Second Circuit has "never endorsed" either test. *Tillman v. N.Y.C. Dep't of Hum. Res. Admin.*, No. 22-872, 2023 WL 2770218, at *1 n.2 (2d Cir. Apr. 4, 2023); *Perkins v. City of New York*, No. 22-196, 2023 WL 370906, at *3 (2d Cir. Jan. 24, 2023) ("We have never specifically addressed in a precedential opinion this intent issue

---

[9] Defendants argue they did not refuse to provide the accommodation, rather, the accommodation was delayed to a misunderstanding. (Defs.' Mot. at 14). Plaintiff argues there is a dispute of fact as to whether the request was delayed or denied because a "Lincoln representative . . . told [her] it was denied[.]" (Bettes Dep., attached to Pl.'s Opp'n as Ex. 5, Dkt. No. 61-49 at 234:7-18; Pl.'s 56.1 Stmt. ¶179; Pl.'s Opp'n at 23). Whether or not Bettes was told her accommodation ticket was closed, it is undisputed that ergonomic equipment was provided when she returned to the office. (Defs.' 56.1 Stmt. ¶ 98; Pl.'s 56.1 Resp. ¶ 98). The proper issues are thus whether delay, or the accommodations provided after the delay, were unreasonable.

in the context of an alleged delay in providing the accommodation."). But under either one, Bettes's claim—based on the delay to provide ergonomic equipment—fails.

Bettes first requested ergonomic equipment for her office desk on August 22, 2022. (Defs.' 56.1 Stmt. ¶ 38; Pl.'s 56.1 Resp. ¶ 38). Lincoln opened the case four days later, and after receiving a questionnaire from Bettes's doctor on September 13 noting that her tendinitis condition was "temporary," (*Id.* ¶ 43; Defs.' 56.1 Stmt. ¶ 43), requested her doctor complete another questionnaire. (*Id.* ¶ 45; Pl.'s 56.1 Resp. ¶ 45). Lincoln followed up with Bettes's doctor and he—on October 4th—clarified that the need for ergonomic equipment was "permanent" but her condition requiring the accommodation was "temporary" pending a post-operation evaluation. (*Id.* ¶¶ 45–47; Defs.' 56.1 Stmt. ¶¶ 45–47). Rather than ignoring the request, two days later the Lincoln representative reported to Altice's HR Accommodations Team several options to accommodate Bettes's request. (*Id.* ¶ 48; Pl.'s 56.1 Resp ¶ 48; Lincoln Email, attached to Hobbs Decl. as Ex. D, Dkt. No. 61-37 at 396–97).

Defendants submit an email exchange in which Altice's HR Accommodations Team member asked the Lincoln's representative on October 28, 2022 whether the ergonomic equipment was still necessary given Bettes's request to work from home post-surgery. (Defs.' 56.1 Stmt. ¶¶ 57–58; Pl.'s 56.1 Resp. ¶¶ 57–58). The Lincoln representative responded that it was not, as the equipment was to work from the office, and that the request should be closed. (*Id.*; Defs.' 56.1 Stmt.¶¶ 57–58). Undisputed evidence indicates that Lincoln misunderstood the initial request—believing the accommodation was unnecessary because Bettes was not going to be in the office. (*Id.*

¶¶ 57–58; Pl.'s 56.1 Resp. ¶¶ 57–58). And when Bettes returned to work in January 2023, it is undisputed that ergonomic equipment was in fact provided. (*Id.* ¶ 98; Defs.' 56.1 Stmt. ¶ 98).

The totality of the circumstances here would not permit a jury to find that the delay was unreasonable. The equipment was provided immediately upon her return to office. (*Id.* ¶¶ 59, 98; Pl.'s 56.1 Resp. ¶¶ 59, 98) (noting Bettes started remote work on November 28, 2022, and returned to the office on January 17, 2023). The time in which she was deprived of the equipment was at best a few weeks (from the time her doctor provided updated information in early October to the time she left the office in late November). There are no indications during this period that Altice was acting in bad faith or intentionally depriving her of this request for some nefarious or illegal reason. All indications in the evidence are that it was based on a mistake about Bettes's continued need for the equipment because of her remote work request. Given the delay was inadvertent, and the accommodation was provided, the delay in providing the ergonomic equipment does not constitute an unreasonable one. *See, e.g.*, *Tillman*, 2023 WL 2770218, at *1 n.2; *Swain v. Wormuth*, 41 F.4th 892, 898 (7th Cir. 2022) ("[A] reasonable juror could not attribute the delay to bad faith. As the district court noted, there is no evidence the Army purposely stalled the project. While the Army could have moved more quickly, given the steps necessary to initiate and then install automatic openers on these doors, a reasonable juror could not say the duration was unreasonable.").

And because there is zero evidence of bad faith conduct by Altice, Bettes also cannot satisfy the alternative test for the claim—that the delay was motivated by some discriminatory intent. Bettes tries to establish that intent, *see* Pl.'s Opp'n at 5, 17, 24, citing two incidents: first, Rivas's criticism of Bettes for an email she sent to staff about communicating with her after her surgery; but he later apologized as having misunderstood the email; and (2) second, Rivas's change of Bettes's sick days to vacation days, but again he did so because of a misunderstanding and made a correction to restore the vacation days, *see* Pl.'s 56.1 Stmt. ¶¶ 176–78, 206–07; Defs.' 56.1 Resp. ¶¶ 176–178, 206–07. So even under the alternative test for a delay-based accommodation claim, the failure to show the necessary intent requires dismissal. *See, e.g.*, *Hamedl v. Weiland*, No. 10-CV-2738, 2012 WL 3903499, at *7 (E.D.N.Y. Sept. 6, 2012) ("Plaintiff has presented no such evidence of discriminatory intent in this case. On the contrary, the evidence submitted indicates only that Verizon processed his request expeditiously, even if it did take several months for the chair to arrive."), *aff'd sub nom.*, *Hamedl v. Verizon Commc'ns, Inc.*, 557 F. App'x 68 (2d Cir. 2014).

As for the separate request for ergonomic equipment post-surgery, Bettes's claim fails as there is no evidence in the record to indicate that the accommodation provided was unreasonable. Where an "employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable,'" ending the analysis. *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1996)). A reasonable accommodation

is one that "enables an individual with a disability who is qualified to perform the essential functions of that position . . . or to enjoy equal benefits and privileges of employment." *Id.* (quotation omitted). While the accommodation must be "effective," employers are "not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Id.* at 95.

Upon Bettes's return to office work in January 2023, Defendants ensured that Bettes's office was equipped with a standing desk and gel wrist pads. (Defs.' 56.1 Stmt. ¶ 98; Pl.'s 56.1 Resp. ¶ 98). Bettes does not dispute that these accommodations were provided, rather she argues that they were not what was prescribed, as Dr. Lieberman had recommended additional ergonomic equipment. (Pl.'s Opp'n at 23; Pl.'s 56.1 Resp. ¶ 98 (noting that Dr. Lieberman's questionnaire in September had also recommended a foot stool and ergonomic desk chair)). But Bettes submits no evidence that Dr. Lieberman's suggested ergonomic equipment, based on pre-surgery restrictions, was necessary to accommodate her post-surgery condition, nor that the accommodations provided were unreasonable. The claim must be dismissed. *See Noll*, 787 F.3d at 95–96 (affirming a grant of summary judgment for an employer where "[t]he summary judgment record establishe[d] that [the employer] provided [the plaintiff] with several accommodations" that the court concluded were reasonable and plaintiff's testimony that they were "not as effective" did not create a genuine material question); *Whitney v. Montefiore Med. Ctr.*, No. 23-7961, 2025 WL 2101512, at *5 (2d Cir. July 28, 2025) (affirming summary judgment where employee did not "identif[y] evidence that would allow a jury to conclude that [defendant]'s failure to comply perfectly with the

granted accommodations somehow rendered the accommodations as a whole unreasonable").

Turning now to the request to work remotely after January 3, 2023, Bettes has failed to show why the accommodations provided, such as the ergonomic equipment and permission to wear lax dress were insufficient.[10] Here, again, Bettes takes issue with the fact that the accommodation provided was not the one requested: to work remotely. She points to Dr. Lieberman's letter stating that she "is to work from home until 2/22/23." (Lincoln File on Remote Work Request ("Lincoln Remote Work File"), attached to Hobbs Decl. as Ex. E, Dkt. No. 61-38 at 488). When Lincoln prompted Dr. Lieberman to explain why Bettes could not work in an office environment, he provided little new information besides that she has "issues" with daily activities like dressing and driving. (*Id.* at 448–49). The only functional impairments he noted were restrictions in lifting, carrying, pushing, and pulling. (*Id.* at 464–65; Hobbs Dec. 14, 2022 Email, attached to Vento Decl. as Ex. M, Dkt. No. 61-15 at 1044 (explaining to Bettes that her doctor "did not indicate any restrictions for computer use" in response to Bettes's protestations for not receiving the accommodations requested)). Bettes sought to work from home because her arm was in a sling and she was struggling to get dressed for work and could not drive herself. (Defs.' 56.1 Stmt. ¶¶ 74, 95; Pl.'s 56.1 Resp. ¶¶ 74, 95; Lincoln Remote Work File at 450 (Dr. Lieberman noted the same challenges)). But there

[10] Defendants contend that Bettes was no longer disabled post-surgery. (Defs.' Mot. at 16). But there is evidence that at the time the request to work from home was made and denied (December 2022) Bettes was still unable to use her left arm, and as such, was physically impaired. (Defs.' 56.1 Stmt. ¶ 74; Pl.'s 56.1 Resp. ¶ 74; Bettes Dep. at 281:6-11 (testifying that she was still in a sling in February 2022)).

is otherwise no evidence to indicate that the accommodations offered were not reasonable. There is no evidence that she was required in her job to engage in the actions Dr. Lieberman explicitly prohibited and she was granted leave to dress down to address her difficulty changing.[11] As to her inability to drive to work, Hobbs offered to provide information on commuter benefits offered. (Defs.' 56.1 Stmt. ¶ 96; Pl.'s 56.1 Resp. ¶ 96). Without more, there is no evidence to show that the accommodation was unreasonable, and the claim fails.[12]

**B. Retaliation**

"The burden-shifting framework under *McDonnell Douglas* also applies to [NYSHRL] retaliation claims[.]" *Tafolla*, 80 F.4th at 125. To establish a prima facie case of retaliation under the NYSHRL, the plaintiff "must demonstrate that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 45 (2d Cir. 2025) (quotation

---

[11] To the extent Bettes alleges that she was penalized for utilizing the accommodation and dressing down, (Pl.'s Opp'n at 27), such arguments go to her retaliation claim and do not factor into her failure to accommodate claim.

[12] Defendants also argue that Bettes's accommodation request to work remotely through February 2023 was not reasonable because her job required her presence in the newsroom and would cause an undue hardship. (Defs.' Mot. at 19–20). Because the claim fails on other grounds, the Court does not address that argument.

omitted).[13] "If the plaintiff establishes a prima facie case of retaliation . . . , the defendant then has the opportunity to offer legitimate reasons for its actions." *Id.* (quotation omitted). If the defendant does so, "the burden shifts back to the plaintiff to show either that the defendant's reasons were pretextual, or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination." *Id.* (quotation omitted).

Defendants contend that even if Bettes established a prima facie case of retaliation, they have offered a legitimate reason for her termination—namely, a larger leadership overhaul that included terminating Bettes, Waldman, and Rivas. (Defs.' Mot. at 23; *see* Dep. of Audrey Gruber ("Gruber Dep."), attached to Vento Decl. as Ex. E, Dkt. No. 61-7 at 9:23–10:2 ("We made a decision to change the entire leadership team that was there, including [Bettes], the assistant news director, and Rob Rivas, the news director.")). But Bettes has come forward with sufficient evidence to infer that the offered basis was pretextual and a reason for her termination was in retaliation for her seeking accommodations before and after her surgery.

"[A] plaintiff need only show that retaliatory animus was a motivating factor, that is, that it played any role at all in the challenged conduct." *Edelman*, 141 F.4th at 49 (quotation omitted); *Uttarwar*, 2025 WL 704278, at *2 (explaining that defendant must "demonstrate that it is entitled to summary judgment under the mixed-motive

[13] Post-amendment, NYSHRL retaliation standards align with the NYCHRL. *See Qorrolli*, 124 F.4th at 122–23. The parties' reliance on pre-amendment and Title VII cases is misplaced. *See McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 67 (S.D.N.Y. 2020) ("Retaliation claims under the NYCHRL are subject to a broader standard than under . . . Title VII." (citing N.Y.C. Admin. Code § 8-107(7))).

standard," that is, that "the record establishes as a matter of law that discrimination . . . played no role in the defendant's actions." (quotations omitted)). "[P]roof of a causal relationship between the protected activity and the adverse action[ ] can be established either (1) directly, through evidence of retaliatory animus toward the plaintiff, or (2) indirectly, through circumstantial evidence." *Edelman*, 141 F.4th at 48 (quotation omitted). The Second Circuit has cautioned against granting judgment as a matter of law where intent is at issue, especially given that "direct evidence of [retaliatory] intent will only rarely be available." *Id.* at 49 (quotation omitted).

"[T]emporal proximity, together with other evidence . . . may be enough to defeat summary judgment." *Uttarwar*, 2025 WL 704278, at *4 (quotation omitted); *see also Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) ("[A] plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage."). For example, hostility to accommodation requests or the accommodations themselves can be the basis for inferring that the proffered reason—ineffective job performance—was pretextual. *See, e.g., Ugactz v. United Parcel Serv., Inc.*, No. 10-CV-1247, 2013 WL 1232355, at *21 (E.D.N.Y. Mar. 26, 2013) ("Plaintiff also points to the hostility in which his reasonable accommodation requests were made as evidence of pretext. According to Plaintiff, when he made requests for reasonable accommodation, rather than accommodate Plaintiff, he and his wife were told that UPS was no longer right for him. . . . [T]hese statements coupled, with temporal proximity, are sufficient for a reasonable jury to find pretext.") (collecting cases)).

Here, there is a very close temporal relationship between Bettes's requests for accommodation and her termination, supporting an inference of retaliatory intent.

Bettes was terminated after a sequence of requests for accommodation, leaves of absence, and conflicts over her requests over the course of five months. Bettes made her first request for an accommodation on August 22, 2022. (Defs.' 56.1 Stmt. ¶ 38; Pl.'s 56.1 Resp. ¶ 38). On October 10, 2022, while her first request was still pending, she submitted a second request for accommodation seeking leave followed by a period of remote work for her scheduled shoulder surgery. (*Id.* ¶ 49; Defs.' 56.1 Stmt. ¶ 49). Also in October, she was on leave for about a week following her mother's hospitalization and death. (*Id.* ¶¶ 32–33; Pl.'s 56.1 Resp. ¶¶ 32–33). Though she was granted leave for her November 22, 2022 shoulder surgery and a period of remote work following her surgery, when she submitted an updated request on December 2, 2022 seeking work from home through February 2023, it was partially denied. (*Id.* ¶¶ 75–76, 84–85, 100; Defs.' 56.1 Stmt. ¶¶ 75–76, 84–85, 100). Bettes protested the denial of the full-length requested given her ongoing restrictions from her surgery, but was instructed by Defendants to return to office work by January 3, 2023. (*Id.* ¶¶ 86–89; Pl.'s 56.1 Resp. ¶¶ 86–89).

When she did not return to in-person work by the designated date she was contacted by Hobbs on January 11, 2023 and instructed to return to the office by January 17, 2023, despite her protests. (*Id.* ¶¶ 92–93, 98; Defs.' 56.1 Stmt. ¶¶ 92–93, 98). Bettes essentially sought further accommodation during that call. (*Id.* ¶ 95; Pl.'s 56.1 Resp. ¶ 95 (Bettes explained during the call that she struggled getting dressed for work, could

not drive herself, and would need to stand during the day)). And then two days later, on January 19, 2023, she again requested leave because she contracted COVID-19. (*Id.* ¶¶ 104–05; Defs' 56.1 Stmt. ¶¶ 104–05). She was fired on the day she was set to return to in-person work on January 26, 2023: only two weeks after she had made the request to extend her ability to work from home. (*Id.* ¶¶ 109, 145; Pl.'s 56.1 Resp. ¶¶ 109, 145).

Bettes was terminated within weeks of her last protected activity and within five months of her first request for accommodation. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) ("Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct."). And here, the close temporal proximity is coupled with evidence of hostility towards Bettes's accommodation requests: a combination that is sufficient basis to infer that the proffered reason for her firing—poor job performance—was pretextual.

Gruber and Malaspina, both of whom were involved in Bettes's termination, testified that Bettes's physical absence from the newsroom (which was due in part to the accommodations she did receive—until January 2, 2023) played a role in her termination. (*See* Gruber Dep., attached to Pl.'s Opp'n as Ex. 6, Dkt. No. 61-50 at 26:7–27:5 (answering affirmatively when asked whether Bettes's termination was partly due to her lack of presence in the newsroom and stating that they "couldn't accommodate any more" as "[Bettes] had the option to return to work"); Dep. of Kristin Malaspina ("Malaspina Dep."), attached to Pl.'s Opp'n as Ex. 1, Dkt. No. 61-45 at 25:1-18 (when asked whether working from home exacerbated the issues with Bettes, answering "[t]he

role is an in-person role. So it's a very challenging role to do when you are not there in person")). Bettes also testified that Rivas, while terminating her, told her that it was "due to [her] recent actions *and availability* and the direction the company is moving, [her] mindset [didn't] align." (Bettes Dep., attached to Vento Decl. as Ex. B, Dkt. No. 61-4 at 284:4-9 (emphasis added); *see also* Bettes Decl. ¶ 59). Having granted an employee an accommodation, but then using that accommodation as a basis to terminate the employee—because the employee was unavailable to do the work—is more than enough for a jury to conclude that the reasons Defendants offered were mere pretext. The attempt to dismiss this retaliation claim on summary judgment fails.

CONCLUSION

For all of these reasons, the Defendants' motion for summary judgment is granted as to Bettes's FMLA claims and her claim for discrimination under the NYSHRL. But the motion is denied as to Bettes's claim for retaliation under the NYSHRL. The parties are directed to file a joint pretrial order by **October 13, 2026**.

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date: September 10, 2026
Central Islip, New York